**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| *In re: Arbor Associates, Inc. Data Security Litigation* | Case No. 1:25-cv-775-JMB-SJB<br><br>Hon. Jane M. Beckering<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT** |

# PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, Carmen De Gisi, Allen Geiler, and Jonifonuku Fowler ("Plaintiffs"), individually and on behalf of the Class defined below of similarly situated persons, alleges the following against Defendant, Arbor Associates, Inc. ("Arbor" or "Defendant"), based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by counsel as to all other matters:

## SUMMARY OF THE CASE

1. This action arises from Arbor's failure to secure the personal identifiable information ("PII")[1] and protected health information ("PHI")[2] (collectively "Private

[1] Personally identifiable information ("PII") generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on its face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers, etc.). The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 CFR § 248.201(b)(8).

[2] Protected health information ("PHI") is a category of information that refers to an individual's medical records and history, which is protected under the Health Insurance Portability and Accountability Act. *Inter alia*, PHI includes test results, procedure descriptions, diagnoses,

Information") of Plaintiffs and the members of the proposed Class, where Arbor provided healthcare services to Plaintiffs and Class members.

2. Plaintiffs seek to hold Defendant responsible for the harms it caused and will continue to cause Plaintiffs and of other similarly situated persons in the massive and preventable cyberattack.

3. Defendant Arbor is a vendor to health care providers that service patients nationwide.[3]

4. Arbor has disclosed that on or about April 17, 2025, Arbor "became aware of unusual network activity" and later "determined that certain files may been acquired without authorization between April 15, 2025 and April 17, 2025[,]" including that Plaintiffs', and Class Members' Private Information from Arbor's computer systems (the "Data Breach") "was contained within the potentially affected data.[4]

5. Arbor subsequently disclosed to government authorities that the PII and/or PHI of numerous individuals was exposed by the Data Breach. Arbor sent out notification letters to some portion of those people, including Plaintiffs.

---

personal or family medical histories and data points applied to a set of demographic information for a particular patient. Under the Health Insurance Portability and Accountability Act, 42 USC § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 CFR § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited May 2, 2025).

[3] https://arbor-associates.com/about/ (last visited July 16, 2025).

[4] *See* Plaintiffs Geiler's Notice Letter, dated July 3, 2025, **Exhibit A** ("Notice Letter").

6. While Defendant claims to have discovered the breach as early as April 17, 2025 Defendant did not begin informing victims of the Data Breach until July 3, 2025 failed to inform victims when or for how long the Data Breach occurred. Indeed, Plaintiffs and Class Members were wholly unaware of the Data Breach until they received letters from Defendant informing them of it. The Notices received by Plaintiffs were dated July 3, 2025.[5]

7. The Private Information that intruders accessed and infiltrated from Arbor's systems included, but is not limited to, "first and last name, contact information, age, biological sex, date of birth, service date, CPT or diagnosis code, medical record number, name of insurance, and/or doctor's name."

8. As a result of the Data Breach, which Arbor failed to prevent, the Private Information of those who received medical services, including Plaintiffs and the proposed Class Members, was stolen.[6]

9. Among myriad industry standards and statutes for protection of sensitive information, PHI is specifically governed by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations. HIPAA requires entities like Arbor to take appropriate technical, physical, and administrative safeguards to secure the privacy of PHI, establishes national standards to protect PHI, and requires timely notice of a breach of unencrypted PHI.

10. Defendant acquired, collected and stored Plaintiffs' and Class Members' Private Information. Therefore, at all relevant times, Defendant knew or should have known that its

---

[5] *See, e.g.*, Plaintiffs Geiler's Notice Letter, dated July 3, 2025, Exhibit A.

[6] *See id.*

services would be used to store and/or share Plaintiffs' and Class Members' sensitive data, including highly confidential Private Information.

11. Instead, Arbor disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement reasonable measures to safeguard their Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. Arbor's woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of its negligence.

12. Further exacerbating Plaintiffs' injuries, Arbor has offered insufficient assurances that all personal data or copies of data have been recovered or destroyed, or that Arbor has adequately enhanced its security practices or dedicated sufficient resources and staff to avoid a similar breach of its network in the future.

13. As a direct and proximate result of the Data Breach, Plaintiffs and Class Members have suffered actual and present injuries, including but not limited to: (a) present, certainly impending, and continuing threats of identity theft crimes, fraud, scams, and other misuses of their Private Information; (b) diminution of value of their Private Information; (c) loss of benefit of the bargain (price premium damages); (d) loss of value of privacy and confidentiality of the stolen Private Information; (e) illegal sales of the compromised Private Information; (f) mitigation expenses and time spent responding to and remedying the effects of the Data Breach; (g) identity theft insurance costs; (h) "out of pocket" costs incurred due to actual identity theft; (i) credit freezes/unfreezes; (j) expense and time spent on initiating fraud alerts and contacting third parties; (k) decreased credit scores; (l) lost work time; (m) anxiety, annoyance, and nuisance; (n) continued risk to their Private Information, which remains in Arbors possession and is subject to further breaches so long as Arbor fails to undertake appropriate and adequate measures to protect

Plaintiffs' and Class Members' Private Information; and (o) disgorgement damages associated with Arbor's maintenance and use of Plaintiffs' data for its benefit and profit.

14. As a vendor serving health care providers, Arbor knowingly obtained sensitive PII and PHI and had a resulting duty to securely maintain that information in confidence. Plaintiffs and Class Members would not have provided valuable PII and sensitive PHI had they known that Arbor would make their Private Information Internet-accessible, not encrypt or otherwise secure personal and sensitive data elements, and not delete the Private Information it no longer had reason to maintain.

15. Through this lawsuit, Plaintiffs seeks to hold Arbor responsible for the injuries it inflicted on Plaintiffs and Class Members due to its impermissibly inadequate data security measures, and to seek injunctive relief to ensure the implementation of security measures to protect the Private Information that remains in Arbor's possession.

16. Plaintiffs seek to remedy these harms individually and on behalf of all other similarly situated individuals whose PII and/or PHI were exposed in the Data Breach. Plaintiffs seek remedies including compensation for time spent responding to the Data Breach and other types of harm, free credit monitoring and identity theft insurance, and injunctive relief including substantial improvements to Arbor's data security policies and practices

## JURISDICTION AND VENUE

17. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The number of class members exceeds 100, and at least one member of the Class defined below is a citizen of a different state that is diverse from Defendant's citizenship. Thus, minimal diversity exists under 28 U.S.C. §1332(d)(2)(A).

18. The Court also has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

19. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District, conducts substantial business here, and has purposefully availed itself of the privileges and benefits of conducting business within this District by marketing, selling, and processing payments for its products and services within this jurisdiction.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant resides in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendant is subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

21. Plaintiff Carmen De Gisi is a resident of Lafayette Hill, Pennsylvania, who received services from Arbor customer Bryn Mawr Medical Specialists Endoscopy Associates.

22. Plaintiffs Geiler is, and at all relevant times has been, a resident and citizen of Wilbur, Washington, where he intends to remain.

23. Plaintiffs Jonifonuku Fowler is an adult individual and, at all relevant times herein, was a resident and citizen of the State of Michigan.

24. Defendant Arbor is a healthcare patient survey analytics company that provides services to healthcare entities and is incorporated under the laws of the State of Michigan, with its principal place of business at 1349 US Hwy 131, Ste C, Petoskey, MI 49770.

25. The true names and capacities of persons or entities, whether individual, corporate, associate or otherwise, who may be responsible for some of the claims alleged here are currently

unknown to Plaintiffs. Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of such responsible parties if and when such identities become known.

## FACTUAL ALLEGATIONS

### A. The Arbor Data Breach

26. Arbor is a company that provides services to the healthcare industry. Arbor conducts Consumer Assessment of Healthcare Providers and Systems ("CAHPS") for healthcare entities.[7]

27. Arbor describes itself as a "trusted partner in patient research and survey analytics for the healthcare industry."[8] Arbor claims that "[b]y hiring Arbor Associates, you gain a trusted research partner . . . [who will] empower you to make data-driven decisions that propel your organization forward."[9]

28. Arbor notes that "Modern HealthCare Magazine recognized Arbor Associates as one of the top ten Patient Satisfaction Survey Firms in the U.S."[10]

29. In the ordinary course of receiving health care services, all Class Members provided their patient information (including Plaintiffs), and Defendant Arbor received this sensitive, personal, and private information, as part of the Class entering into a healthcare professional-patient relationship, and as a part of Class Members receiving medical services.

30. Due to the nature of the services it provides, Arbor acquires and electronically stores PII and PHI. Arbor was therefore required to ensure that PII and PHI were not disclosed or

[7] https://arbor-associates.com/about/ (last visited Nov. 13, 2025).

[8] *Id.*

[9] *Id.*

[10] *Id.*

disseminated to unauthorized third parties without Plaintiffs' and Class Members' express written consent.

31. On or about April 15, 2025, through July 17, 2025, Plaintiffs' and Class Members' Private Information in possession of Arbor was accessed without authorization, which Arbor describes in its Notice Letter.[11]

32. Months later, On July 3, 2025, Arbor reported to the California Attorney General that a breach of its patient data occurred on April 15, 2025, which it did not discover until April 17, 2025.[12]

33. On or around July 8, 2025, Arbor reported the Data Breach to the Texas Attorney General. That report reflects that 1,524 individuals in Texas alone were affected by the Data Breach.[13]

34. On or about July 3, 2025, Arbor began sending out Notice Letters to affected persons, informing them that their Private Information had been compromised in the Data Breach:

> *What Happened?*
> On April 17th, 2025, Arbor became aware of unusual network activity and immediately took steps to secure our systems and perform an investigation. We engaged independent cybersecurity experts to assist with the process. The investigation determined that certain files may have been acquired without authorization between April 15, 2025 and April 17, 2025. As a result, we undertook a comprehensive review of the potentially affected files and, in May 2025, learned that some of your information was contained within the potentially affected data. We then contacted Coulee Medical Center[14] and worked with them to provide you this notice.

---

[11] *See* Notice Letter.

[12] https://oag.ca.gov/ecrime/databreach/reports/sb24-604990 (last visited Nov. 13, 2025).

[13] https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Nov. 13, 2025).

[14] Plaintiffs Geiler received healthcare services from Coulee Medical Center – the healthcare provider listed in the Notice Letter is individualized for each Class Member.

> *What Information Was Involved?*
> The potentially affected information may have included you first and last name, contact information, age, biological sex, date of birth, service date, CPT or diagnosis code, medical record number, name of insurance, and/or doctor's name.[15]

35. According to publicly filed documents, the Data Breach affected thousands of persons.

36. Upon information and belief, the cyberattack was targeted at Defendant, due to its status as a healthcare vendor that collects, creates, and maintains Private Information on its computer networks and/or systems.

37. In the course of the Data Breach, one or more unauthorized third parties accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiffs and Class Members, including but not limited to, "first and last name, contact information, age, biological sex, date of birth, service date, CPT or diagnosis code, medical record number, name of insurance, and/or doctor's name."[16]

38. Plaintiffs were not aware of the Data Breach until receiving Arbor's belated letter.

39. Arbor's disclosures are otherwise deficient. They do not include basic details concerning the Data Breach, including, but not limited to, why PII and PHI were stored on systems without adequate security, the deficiencies in the security systems that permitted unauthorized access, whether the data was encrypted or otherwise protected, and what Arbor knows about the degree to which the data has been disseminated.

40. Arbor has failed to disclose practically all of the details of the Data Breach and its investigation into the Data Breach. Without such disclosure, questions remain as to the full extent of the Data Breach, the actual data accessed and compromised, and what measures, if any, Arbor

---

[15] *See id.*

[16] *See id.*

has taken to secure the PII and PHI still in its possession. Plaintiffs seek to determine the scope of the Data Breach and the information involved, obtain relief that redresses the harm to Plaintiffs' and Class Members' interests, and ensure that Arbor has proper measures in place to prevent similar incidents from occurring in the future.

41. As evidenced by the Data Breach, Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, causing the exposure of Private Information.

42. As evidenced by the Data Breach, the Private Information contained in Defendant's network was not encrypted. Had the information been properly encrypted, the data thieves would have exfiltrated only unintelligible data.

**B. The Value of Private Information**

43. Arbor was aware that the Private Information it collected is highly sensitive and of significant value to those who would use it for wrongful purposes.

44. While the greater efficiency of electronic health records translates to cost savings for providers, it also comes with the risk of privacy breaches. PII and PHI contain a plethora of sensitive information (e.g., patient data, patient diagnosis, lab results, medical prescriptions, treatment plans, etc.) that is valuable commodities to identity thieves and cybercriminals. As the Federal Trade Commission (the "FTC") recognizes, identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud.[17]

45. In April 2020, ZDNet reported in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year", that "[r]ansomware gangs are now ferociously aggressive

[17] Federal Trade Commission, What To Know About Identity Theft (available at https://consumer.ftc.gov/articles/what-know-about-identity-theft) (last accessed Nov. 13, 2025).

in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for complaints as revenge against those who refuse to pay."[18]

46. Indeed, a robust illegal market exists in which criminals openly post stolen PII and PHI on multiple underground websites, commonly referred to as the "dark web." The high value of such data is reflected in the prices buyers will pay: PHI, for example, has been reported to sell for as much as $363 on the dark web, according to the Infosec Institute. [19]

47. PHI is particularly valuable because criminals can use it to target victims with frauds and swindles that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

48. Moreover, "fullz" packages, which include "extra information about [a] legitimate credit card owner in case" a scammer's "bona fides are challenged when they attempt to use the credit card" are also offered on the dark web.[20]

49. Stolen Private Information is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

---

[18] https://www.zdnet.com/article/ransomware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited Nov. 13, 2025).

[19] Center for Internet Security, *Data Breaches: In the Healthcare Sector* (available at https://www.cisecurity.org/blog/data-breaches-in-the-healthcare-sector/) (last accessed Nov. 13, 2025).

[20] Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web, Armor (Apr. 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud- dark-web/ (last accessed Nov. 13, 2025).

50. When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[21]

51. The Private Information of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, Private Information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[22] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[23] Criminals can also purchase access to entire company data breaches from $999 to $4,995.[24]

52. In addition, due to the highly valuable nature of PHI, the FBI has warned healthcare providers that they are likely to be the targets of cyberattacks like the one at issue here.[25]

53. Once Private Information is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends and colleagues of the original victim.

---

[21] *Shining a Light on the Dark Web with Identity Monitoring, IdentityForce*, Dec. 28, 2020, https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Nov. 13, 2025).

[22] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal- data-sold-on-the-dark-web-how-much-it-costs/ (last visited Nov. 13, 2025).

[23] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is- selling-for-on-the-dark-web/ (last visited Nov. 13, 2025).

[24] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the- dark/ (last visited Nov. 13, 2025).

[25] Jim Finkle, *FBI warns healthcare firms they are targeted by hackers*, REUTERS (Aug. 20, 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi-idUSKBN0GK24U20140820.

54. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

55. Data breaches facilitate identity theft as hackers obtain consumers' Private Information and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

56. Further, criminals often trade stolen PII and PHI for years following a breach. Cybercriminals can post stolen PII and PHI on the internet, thereby making such information publicly available. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use Private Information to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[26]

57. The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime.[27] Approximately 21% of victims do not realize their identity has been compromised until more than two years after it happens.[28] This gives thieves ample time to seek multiple treatments under the victim's name. In fact, forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters

---

[26] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), https://www.gao.gov/assets/gao- 07-737.pdf (last visited Nov. 13, 2025).

[27] *Id.*

[28] *See* Medical ID Theft Checklist (available at https://www.identityforce.com/blog/medical-id-theft-checklist-2) (last accessed Nov. 13, 2025).

from creditors for expenses that were incurred in their names.[29] The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[30]

58. The market for Private Information has continued unabated to the present, and in 2023 the number of reported data breaches in the United States increased by 78% over 2022, reaching 3205 data breaches.[31]

59. The exposure of Plaintiffs' and Class Members' Private Information to cybercriminals will continue to cause substantial risk of future harm (including identity theft) that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off of this highly sensitive information.

60. Arbor knew, or should have known, the importance of safeguarding PII and PHI entrusted to it and of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Plaintiffs and Class Members because of a breach. Arbor failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring. As detailed above, Defendant knew or should have known that the development and use of such protocols were necessary to fulfill its statutory and common law

---

[29] Experian, The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches (available at https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf) (last accessed Nov. 13, 2025).

[30] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent* (2007).

[31] Beth Maundrill, *Data Privacy Week: US Data Breaches Surge, 2023 Sees 78% Increase in Compromises*, INFOSECURITY MAGAZINE (Jan. 23, 2024); https://www.infosecurity-magazine.com/news/us-data-breaches-surge-2023/ (last visited Nov. 13, 2025); see also Identity Theft Resource Center, *2023 Data Breach Report*, https://www.idtheftcenter.org/publication/2023-data-breach-report/ (last visited Nov. 13, 2025).

duties to Plaintiffs and Class Members. Its failure to do so is therefore intentional, willful, reckless and/or grossly negligent.

61. Defendant disregarded the rights of Plaintiffs and Class Members by, inter alia, (i) intentionally, willfully, recklessly and/or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions, (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' Private Information, (iii) failing to take standard and reasonably available steps to prevent the Data Breach, (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time, and (v) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

**C. Entities in the Healthcare Field are Prime Targets for Cyberattacks.**

62. Arbor was on notice that Entities in the Healthcare field are susceptible to and prime targets for cyberattacks because of the information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, and personal information of employees, customers and patients—all extremely valuable in underground markets.

63. This was known and obvious to Arbor as they observed frequent public announcements of data breaches affecting the healthcare industry and knew that information of the type it collected, maintained, and stored is highly coveted and a frequent target of cybercriminals.

64. For example, a report by the HIPAA Journal noted that "Between 2009 and 2022, 5,150 healthcare data breaches of 500 or more records have been reported to the HHS' Office for Civil Rights. Those breaches have resulted in the exposure or impermissible disclosure of 382,262,109 healthcare records. That equates to more than 1.2X the population of the United

States. In 2018, healthcare data breaches of 500 or more records were reported at a rate of around 1 per day. Fast forward 5 years and the rate has more than doubled. In 2022, an average of 1.94 healthcare data breaches of 500 or more records were reported each day."[32]




65. Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[33]

66. Arbor was also on notice that the Federal Bureau of Investigation has been concerned about data security in the healthcare industry. On April 8, 2014, the FBI's Cyber Division issued a Private Industry Notification to companies within the healthcare sector, stating

---

[32] https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited Nov. 13, 2025).

[33] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, https://www.armor.com/resources/blog/stolen-pii- ramifications- identity-theft-fraud-dark-web/ (last visited Nov. 13, 2025).

that "the health care industry is not technically prepared to combat against cyber criminals' basic cyber intrusion tactics, techniques and procedures (TTPs), much less against more advanced persistent threats (APTs)" and pointed out that "[t]he biggest vulnerability was the perception of IT healthcare professionals' beliefs that their current perimeter defenses and compliance strategies were working when clearly the data states otherwise." The same warning specifically noted that "[t]he FBI has observed malicious actors targeting healthcare-related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or PII."[34]

67. Ransomware attacks are especially prevalent in the industry. For years federal agencies have warned about the increasing risk of ransomware attacks on companies holding PII and PHI. For example, in October 2019 the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[35]

68. In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to

[34] Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain (Apr. 8, 2014), FBI Cyber Division Private Industry Notification (available at https://info.publicintelligence.net/FBI-HealthCareCyberIntrusions.pdf) (last accessed Nov. 13, 2025).

[35] https://www.ic3.gov/Media/Y2019/PSA191002 (last visited Nov. 13, 2025).

release stolen data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[36]

69. In March 2021, Tenable Security Response Team conducted a root cause analysis of 293 healthcare breaches known to have exposed records between January 2020 and February 2021 and concluded that "ransomware was by far the most prominent root case of healthcare breaches, accounting for a whopping 54.95%."[37]

70. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more than identity thefts involving banking and finance, the government and the military, or education.[38]

71. The number of reported North American data breaches increased by over 50 percent in 2021, from 1,080 in 20207, to 1,638 in 2021.[39] As a recent report reflects, "[h]ealthcare has increasingly become a target of run-of-the-mill hacking attacks and the more impactful ransomware campaigns."[40]

72. At the end of 2018, the healthcare sector ranked second in the number of data breaches among measured sectors, and had the highest rate of exposure for each breach.[41] Indeed, when

---

[36] https://www.cisa.gov/stopransomware/ransomware-faqs#:~:text=Malicious%20 actors%20continue%20to%20adjust,as%20secondary%20forms%20of%20extortion (last visited Nov. 13, 2025).

[37] https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches (last visited Nov. 13, 2025).

[38] Michael Ollove, "*The Rise of Medical Identity Theft in Healthcare*," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/.

[39] *See* Verizon 2021 Data Breach Investigations Report, at 83, https://www.verizon.com/business/resources/reports/2021-data-breach-investigations-report.pdf (last accessed Nov. 13, 2025).

[40] *Id.* at 62.

[41] *2018 End-of-Year Data Breach Report*, Identity Theft Resource Center (available at https://www.idtheftcenter.org/2018-data-breaches) (last accessed Nov. 13, 2025).

compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[42] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy.[43]

73. Healthcare-related breaches have persisted because criminals see electronic patient data as a valuable asset. According to the 2019 HIMSS Cybersecurity Survey, 82 percent of participating hospital information security leaders reported having a significant security incident in the previous 12 months, with a majority of these known incidents being caused by "bad actors" such as cybercriminals.[44] "Hospitals have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[45]

---

[42] Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010) (available at https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/) (last accessed Nov. 13, 2025).

[43] *Id.*

[44] 2019 HIMSS Cybersecurity Survey (available at https://www.himss.org/sites/hde/files/d7/u132196/2019_HIMSS_Cybersecurity_Survey_Final_Report. pdf) (last accessed Nov. 13, 2025).

[45] Inside Digital Health, *How to Safeguard Hospital Data from Email Spoofing Attacks*, Apr. 4, 2019 (available at https://www.idigitalhealth.com/news/how-to-safeguard-hospital-data-from-email-spoofing-attacks) (last accessed Nov. 13, 2025).

74. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[46]

75. Despite all the publicly available knowledge of the serious threat of compromises of personal information and despite holding the Private Information of millions of individuals, Arbor failed to use reasonable care in maintaining the privacy and security of Plaintiffs' and Class Members' Private Information.

76. Had Arbor implemented adequate security measures, cybercriminals never could have accessed millions of individuals' files and the Data Breach would have been prevented or much smaller in scope.[47]As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[48] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised…."[49]

77. As major healthcare services providers, Arbor was, or should have been, fully aware of the significant number of individuals whose Private Information it collected and stored, thus, the significant number of individuals who would be harmed by a breach of Arbor's systems.

---

[46] Andis Robeznieks, Cybersecurity: *Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019) (available at https://www.ama-assn.org/practice-

[47] Lucy L. Thompson, "*Despite the Alarming Trends, Data Breaches Are Preventable*," in DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[48] *Id.* at 17.

[49] *Id.* at 28.

78. Accordingly, Arbor knew, or reasonably should have known, of the importance of safeguarding Private Information and the foreseeable consequences that would occur if its data security systems were breached, including, specifically, the significant costs that would be imposed on affected individuals as a result of the breach.

**D. Arbor Failed to Comply with Regulatory Requirements and Standards.**

79. Federal and state regulators have established security standards and issued recommendations to temper data breaches and the resulting harm to consumers and the healthcare sector. There are a number of state and federal laws, requirements, and industry standards governing the protection of Private Information.

80. For example, at least 24 states have enacted laws addressing data security practices that require businesses that own, license, or maintain Private Information about a resident of that state to implement and maintain "reasonable security procedures and practices" and to protect Private Information from unauthorized access.

81. Additionally, cybersecurity firms have promulgated a series of best practices that at a minimum should be implemented by sector participants including, but not limited to: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting of physical security systems; protecting against any possible communication system; and training staff regarding critical points.[50]

[50] *See Addressing BPO Information Security: A Three-Front Approach*, DATAMARK, INC. (Nov. 2016), https://insights.datamark.net/addressing-bpo-information-security (last visited Nov. 13, 2025).

82. The FTC has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[51]

83. Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[52]

84. The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

85. The FTC advises companies to not keep information for longer periods of time than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

86. The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

---

[51] *Start With Security*, Fed. Trade Comm'n ("FTC"), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Nov. 13, 2025).

[52] *Protecting Personal Information: A Guide for Business*, FTC, https://www.ftc.gov/system/files/ documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 13, 2025).

Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

87. Arbor's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

88. Arbor's failure to verify that it had implemented reasonable security measures constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

89. Furthermore, Arbor is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C. The Privacy Rule and the Security Rule set nationwide standards for protecting health information, including health information stored electronically.

90. The Security Rule requires Arbor to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.[53]

91. Pursuant to HIPAA's mandate that Arbor follow "applicable standards, implementation specifications, and requirements . . . with respect to electronic protected health

[53] *Summary of the HIPAA Security Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html (last visited Nov. 13, 2025).

information," 45 CFR § 164.302, Arbor was required to, at minimum, "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(e), and "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 CFR § 164.312(a)(1).

92. Arbor is also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). See 42 USC § 17921, 45 CFR § 160.103.

93. Both HIPAA and HITECH obligate Arbor to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive patient Private Information. See 45 CFR § 164.306(a)(1) and § 164.306(a)(3); 45 CFR § 164.530(f); 42 USC § 17902.

94. Arbor was at all times fully aware of its obligation to protect Plaintiffs' and Class Members' PII and PHI because of its position as a healthcare provider. Arbor was also aware of the significant repercussions that would result from its failure to do so.

95. As alleged in this Complaint, Arbor has failed to comply with HIPAA and HITECH. It has failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach and loss of data, and failed to ensure the confidentiality and protection of PHI.

**E. Arbor Failed to Comply with Industry Practices.**

96. Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The

Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[54] All organizations collecting and handling Private Information, such as Arbor, are strongly encouraged to follow these controls.

97. Further, the CIS Benchmarks are the overwhelming option of choice for auditors worldwide when advising organizations on the adoption of a secure build standard for any governance and security initiative, including PCI DSS, HIPAA, NIST 800-53, SOX, FISMA, ISO/IEC 27002, Graham Leach Bliley and ITIL.[55]

98. Cybersecurity experts normally have identified data management companies, like Arbor as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect, use, and maintain.[56]

99. Several best practices have been identified that a minimum should be implemented by data management companies like Arbor, including but not limited to securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software, maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, and securing application software.[57]

---

[54] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Nov. 13, 2025).

[55] *See CIS Benchmarks FAQ*, Center for Internet Security, https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/ (last visited Nov. 13, 2025).

[56] *See Security Questions to Ask After the ZeroedIn Breach*, Information Week, https://www.informationweek.com/cyber-resilience/security-questions-to-ask-after-the-zeroedin-breach (last visited Nov. 13, 2025) (commenting that the growing outsourcing of data analytics work to third-party service providers may offer to malicious cyber-attackers novel "targets of opportunity – breach one data manager and gain access to data from a multitude of sources.).

[57] *See* Center for Internet Security, *Critical Security Controls* (May 2021), https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Nov. 13, 2025).

100. Other best practices have been identified that a minimum should be implemented by companies like Arbor using third-party providers, including but not limited to ensuring that Private Information is only shared with third parties when reasonably necessary and that those vendors have appropriate cybersecurity systems and protocols in place.[58]

101. Arbor failed to follow these and other industry standards to adequately protect the Private Information of Plaintiffs and Class Members.

**F. Defendant's Conduct Violated HIPAA**

102. HIPAA requires covered entities such as Defendant to protect against reasonably anticipated threats to the security of sensitive patient health information.

103. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

104. Arbor is bound by HIPAA (see 45 C.F.R. § 160.102) and, as a result, is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

105. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, et seq. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules

[58] *See id.*

include 45 C.F.R. § 164.306(a) (1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

106. These rules establish national standards for the protection of patient information, including protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. *See* 45 C.F.R. § 160.103.

107. HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."

108. HIPAA requires that Arbor implement appropriate safeguards for this information.

109. A Data Breach such as the one Defendant experienced, is considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, ". . . the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." See 45 C.F.R. 164.40.

110. Furthermore, unlike like most healthcare entities, Arbor's website makes no reference to HIPAA, and does not maintain a copy of the "Notice of Privacy Practices" that HIPAA requires all healthcare providers to make available to their patients.

111. Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate it failed to meet mandated by HIPAA regulations and their own Privacy Practices. In particular, Arbor failed to:

a. maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. adequately protect Plaintiffs' and Class Members' PHI;

c. ensure the confidentiality and integrity of electronic PHI created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d. implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e. implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

g. protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h. ensure compliance with the electronic PHI security standard rules by their workforce, in violation of 45 C.F.R. § 164.306(a)(4); and/or

i. train all members of their workforce effectively on the policies and procedures with respect to PHI as necessary and appropriate for the members of their workforce to carry out their responsibilities and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b).

112. Arbor failed to comply with its duties under HIPAA despite being aware of the risks associated with unauthorized access to Plaintiffs' and Class Members' PHI.

**G. Defendant Collected/Stored Class Members' Private Information**

113. Defendant acquired, collected, stored and assured reasonable security over Plaintiffs' and Class Members' Private Information.

114. As a condition of its relationships with Plaintiffs and Class Members, Defendant required that Plaintiffs and Class Members entrust Defendant with highly sensitive and confidential Private Information. Defendant, in turn, stored that information on Defendant's system that was ultimately affected by the Data Breach.

115. By obtaining, collecting and storing Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties over the Private Information and knew

or should have known that it was thereafter responsible for protecting Plaintiffs and Class Members' Private Information from unauthorized disclosure.

116. Certain pages on Arbor's website claim that "[w]e take patient privacy very seriously at Arbor Associates. Understanding that patients may be in a very delicate state following treatment, we've taken extra care to implement safeguards within our systems to prevent any possibility of their privacy being compromised."[59]

117. Plaintiffs and Class Members have taken reasonable steps to maintain their Private Information's confidentiality. Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for business purposes only and to make only authorized disclosures of this information.

118. Defendant could have prevented the Data Breach by properly securing and encrypting and/or more securely encrypting its servers generally, as well as Plaintiffs' and Class Members' Private Information.

119. Defendant's negligence in safeguarding Plaintiffs' and Class Members' Private Information is exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

120. Due to the high-profile nature of these breaches, and other breaches of its kind, Defendant was and/or certainly should have been on notice and aware of such attacks occurring in its industry and, therefore, should have assumed and adequately performed the duty of preparing for such an imminent attack. This is especially true given that Defendant is a sophisticated operation with the resources to put adequate data security protocols in place.

---

[59] *See, e.g.*, https://arbor-associates.com/hospital-cahps/ (last visited Nov. 13, 2025).

121. And yet, despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect Plaintiffs and Class Members' Private Information from being compromised.

**H. Defendant's Failed Response to the Breach**

122. Upon information and belief, the unauthorized third-party cybercriminals gained access to Plaintiffs' and Class Members' Private Information with the intent of misusing the Private Information, including marketing and selling Plaintiffs' and Class Members' Private Information.

123. Not until long after it claims to have discovered the Data Breach did Defendant begin sending the Notice to persons whose Private Information Defendant confirmed was potentially compromised as a result of the Data Breach. And The Notice only provided basic details of the Data Breach and Defendant's recommended next steps.

124. Plaintiffs and Class Members were required to provide their Private Information to Defendant in order to receive services and/or employment. Thus, Defendant created, collected and stored Plaintiffs' and Class Members' Private Information with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

125. Despite this, Plaintiffs and the Class Members remain, even today, in the dark regarding what particular data was stolen, the particular malware used and what steps are being taken, if any, to secure their Private Information going forward. Plaintiffs and Class Members are thus left to speculate as to where their Private Information ended up, who has used it and for what potentially nefarious purposes. Indeed, they are left to further speculate as to the full impact of the

Data Breach and how exactly Defendant intends to enhance its information security systems and monitoring capabilities so as to prevent further breaches.

126. Plaintiffs' and Class Members' Private Information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed Private Information for targeted marketing without Plaintiffs' and/or Class Members' approval. Either way, unauthorized individuals can now easily access Plaintiffs' and Class Members' Private Information.

**I. Defendant Had an Obligation to Protect the Stolen Information**

127. In failing to adequately secure Plaintiffs' and Class Member's sensitive data, Defendant breached duties it owed Plaintiffs and Class Members under statutory and common law.

128. Plaintiffs and Class Members surrendered their highly sensitive Private Information to Defendant under the implied condition that Defendant would keep it private and secure. Accordingly, Defendant also has an implied duty to safeguard their Private Information, independent of any statute.

129. Defendant was also prohibited by the FTC Act from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

130. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the Private Information in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant owed a duty to Plaintiffs and Class Members to provide reasonable security, including consistency with

industry standards and requirements, and to ensure that its computer systems, networks and protocols adequately protected Plaintiffs' and Class Members' Private Information.

131. Defendant owed a duty to Plaintiffs and Class Members to design, maintain and test its computer systems, servers and networks to ensure that all Private Information in its possession was adequately secured and protected.

132. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect all Private Information in its possession, including not sharing information with other entities who maintained sub-standard data security systems.

133. Defendant owed a duty to Plaintiffs and Class Members to implement processes that would immediately detect a breach of its data security systems in a timely manner.

134. Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

135. Defendant owed a duty to Plaintiffs and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' Private Information from theft because such an inadequacy would be a material fact in the decision to entrust their Private Information to Defendant.

136. Defendant owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

137. Defendant owed a duty to Plaintiffs and Class Members to encrypt Plaintiffs' and Class Members' Private Information and monitor user behavior and activity in order to identity possible threats.

**J. The Data Breach Caused Injury to Class Members and Will Result in Additional Harm Such as Fraud.**

138. Without detailed disclosure to the victims of the Data Breach, individuals whose Private Information was compromised by the Data Breach, including Plaintiffs and Class Members, were unknowingly and unwittingly exposed to continued misuse and ongoing risk of misuse of their Private Information for months without being able to take available precautions to prevent imminent harm.

139. The harm to Plaintiffs and Class Members is acute given the nature of the leaked data. Medical identity theft is one of the most common, most expensive forms of identity theft.

140. Medical identity theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's PHI is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities." [60]

141. When cybercriminals access financial information, health insurance information and other personally sensitive data—as they did here—there is no limit to the amount of fraud to which Defendant may have exposed Plaintiffs and Class Members.

142. A study by Experian found that the average total cost of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced

[60] Ollove, "*The Rise of Medical Identity Theft in Healthcare*," Kaiser Health News.

to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[61] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[62]

143. The ramifications of Arbor's failure to secure Plaintiffs' and Class Members' data are long lasting and severe.

144. In virtually all contexts, the expenditure of time has consistently been recognized as compensable, and for many people, it is the basis on which they are compensated. Plaintiffs and Class Members should be compensated for the time they have expended because of Arbor's misfeasance.

145. Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes.[63] This conclusion is based on an analysis of four years of data that correlated each year's data breach victims with those who also reported being victims of identity fraud.

146. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[64] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security

---

[61] Elinor Mills, "*Study: Medical Identity Theft is Costly for Victims*," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/.

[62] *Id.*; *see also* Healthcare Data Breach: What to Know About them and What to Do After One, EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[63] 2014 LexisNexis True Cost of Fraud Study (available at https://www.lexisnexis.com/risk/downloads/assets/true-cost-fraud-2014.pdf) (last accessed Nov. 13, 2025).

[64] 17 CFR § 248.201 (2013).

number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[65]

147. Identity thieves can use Private Information, such as that of Plaintiffs and Class Members, which Arbor failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

148. As demonstrated herein, these and other instances of fraudulent misuse of the compromised Private Information have already occurred and are likely to continue.

149. As a result of Arbor's delay between the Data Breach in November and the notice of the Data Breach sent to affected persons in April, the risk of fraud for Plaintiffs and Class Members increased exponentially.

150. And Plaintiffs and Class Members were unknowingly exposed to continued risk of misuse of their Private Information for months without being able to take available precautions to prevent imminent harm.

151. Javelin Strategy and Research reported that identity thieves stole $112 billion from 2011 through 2016.[66]

152. Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and

---

[65] *Id.*

[66] *See* https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-hits-inflection-point (last visited Nov. 13, 2025).

their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[67]

153. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

154. The 2017 Identity Theft Resource Center survey[68] evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed;
- 67% reported anxiety;
- 66% reported feelings of fear related to personal financial safety;
- 37% reported fearing for the financial safety of family members;
- 24% reported fear for their physical safety;
- 15.2% reported a relationship ended or was severely and negatively impacted by identity theft; and
- 7% reported feeling suicidal.

155. Identity theft can also exact a physical toll on its victims. This survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;
- 37.1% reported an inability to concentrate / lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;

[67] *Victims of Identity Theft*, Bureau of Justice Statistics (Sept. 2015) http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Nov. 13, 2025).

[68] *Id.*

- 23.1% reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[69]

156. The ramifications of Arbor's failure to protect Plaintiffs' and Class Members' PII and PHI are severe and long-lasting. Once such information is stolen, the resulting fraudulent use of that information and damage to victims may persist for years and often do not surface until months or even years later. Here, hackers stole Plaintiffs' and Class Members' Private Information to commit identity theft or sell it to other criminals for that purpose.

157. There may be a time lag between when harm occurs versus when it is discovered, and also between when private information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[70]

Thus, Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

**K. Plaintiffs and Class Members Suffered Damages.**

158. As a direct and proximate result of Arbor's wrongful actions and inaction and the resulting Data Breach, Plaintiffs and Class Members have already been harmed by the fraudulent misuse of their Private Information, and have been placed at an imminent, immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them

---

[69] *Id.*

[70] GAO, *Report to Congressional Requesters*, at 29 (June 2007), http://www.gao.gov/new.items/d07737.pdf (last visited Nov. 13, 2025).

to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate both the actual and potential impact of the Data Breach on their lives. Such mitigatory actions include, *inter alia*, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, sorting through dozens of phishing and spam emails, texts, and phone communications, and filing police reports. This time has been lost forever and cannot be recaptured.

159. Arbor's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and Class Members' Private Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a. theft and misuse of their PII, PHI, and financial information;

b. lost or diminished value of their PII and PHI;

c. lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach;

d. loss of the benefit of their bargain;

e. statutory damages;

f. nominal damages;

g. the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their Private Information being placed in the hands of criminals and misused via the sale of Plaintiffs' and Class Members' information on the Internet's black market;

h. the untimely and inadequate notification of the Data Breach;

i. the improper disclosure of their Private Information;

j. invasion and loss of privacy;

k. ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

l. ascertainable losses in the form of deprivation of the value of their Private Information, for which there is a well-established national and international market;

m. the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach; and

n. the continued and certainly increased risk to their PII and PHI, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Arbor's possession and is subject to further unauthorized disclosures so long as Arbor fails to undertake appropriate and adequate measures to protect the PII and PHI.

160. While Plaintiffs' and Class Members' Private Information has been stolen, Arbor continues to hold Plaintiffs' and Class Members' Private Information. Particularly because Arbor has demonstrated an inability to prevent a breach or stop it from continuing even after being detected, Plaintiffs and Class Members have an undeniable interest in ensuring that their Private Information is secure, remains secure, is properly and promptly destroyed, and is not subject to further theft.

**Plaintiff De Gisi's Experience**

161. Plaintiff De Gisi is or was, at all relevant times, a patient at Arbor customer Bryn Mawr Medical Specialists Endoscopy Associates.

162. Arbor obtained Plaintiff De Gisi's Private Information in the course of its regular business operations.

163. At some point after the Data Breach, one or more unauthorized persons attempted to place fraudulent charges on Plaintiff De Gisi's credit card at several overseas locations. Plaintiff

De Gisi previously used the same credit card to pay Bryn Mawr Medical Specialists Endoscopy Associates.

164. Plaintiff De Gisi has experienced a dramatic increase in scam text messages and calls to his mobile phone, including calls from AI bots designed to mimic calls from credit card companies.

165. Plaintiff De Gisi received a Notice Letter from Arbor concerning the Data Breach dated July 3, 2025, which informed him that his Private Information had been compromised in the Data Breach.[71]

166. Plaintiff De Gisi would not have entrusted his Private Information as a part of receiving medical services had he known Arbor would not take reasonable steps to safeguard his information.

167. Plaintiff De Gisi has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

168. Plaintiff De Gisi is very careful about sharing sensitive Private Information. Plaintiff De Gisi stores documents containing Private Information in safe and secure locations and have never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source. Plaintiff De Gisi would not have entrusted his Private Information to Arbor had he known of Arbor's lax data security policies.

169. As a direct and proximate result of the Data Breach, Plaintiff De Gisi has made reasonable efforts to mitigate the impact of the Data Breach and has spent substantial time monitoring his Private Information and online accounts.

---

[71] *See* ECF No. 1-1, PageID.34-37.

170. As a result of the Data Breach, Plaintiff De Gisi anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. Plaintiff De Gisi has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

**Plaintiff Geiler's Experience**

171. Plaintiff Geiler is or was a patient and received medical services from Coulee Medical Center, a medical provider for which Arbor provided services on their behalf.

172. Arbor obtained Plaintiff Geiler's Private Information in the course of its regular business operations.

173. At the time of the Breach and through today, Arbor retained Plaintiff Geiler's Private Information.

174. Plaintiff Geiler entrusted his Private Information as a part of and condition of receiving medical services.

175. Plaintiff Geiler received a Notice Letter from Arbor concerning the Data Breach dated July 3, 2025, which informed him that his Private Information had been compromised in the Data Breach.

176. Plaintiff Geiler would not have entrusted his Private Information as a part of receiving medical services had he known Arbor would not take reasonable steps to safeguard his information.

177. Plaintiff Geiler has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

178. Plaintiff Geiler is very careful about sharing sensitive Private Information. Plaintiff Geiler stores documents containing Private Information in safe and secure locations and have

never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source. Plaintiff Geiler would not have entrusted his Private Information to Arbor had he known of Arbor's lax data security policies.

179. As a direct and proximate result of the Data Breach, Plaintiff Geiler has made reasonable efforts to mitigate the impact of the Data Breach and has spent substantial time monitoring his Private Information and online accounts.

180. As a result of the Data Breach, Plaintiff Geiler anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the harms caused by the Data Breach. Plaintiff Geiler has faced and faces a present and continuing risk of fraud and identity theft for his lifetime.

**Plaintiff Fowler's Experience**

181. Plaintiff Fowler's Private Information was exposed in the Data Breach because Defendant stored and/or shared Plaintiff Fowler's Private Information. Plaintiff Fowler's Private Information was within the possession and control of Defendant at the time of the Data Breach.

182. Plaintiff Fowler received a letter from Defendant stating Plaintiff Fowler's Private Information was involved in the Data Breach.

183. As a result, Plaintiff Fowler spent time dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, exploring credit monitoring and identity theft insurance options, self-monitoring Plaintiff Fowler's accounts and seeking legal counsel regarding Plaintiffs' options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured.

184. Plaintiff Fowler suffered actual injury in the form of damages to and diminution in the value of Plaintiff Fowler's Private Information—a form of intangible property that Plaintiff Fowler entrusted to Defendant, which was compromised in and as a result of the Data Breach.

185. Plaintiff Fowler suffered lost time, annoyance, interference and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using and selling Plaintiff Fowler's Private Information.

186. Plaintiff Fowler suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft and misuse resulting from Plaintiff Fowler's Private Information being placed in the hands of unauthorized third parties/criminals.

187. Plaintiff Fowler has a continuing interest in ensuring that Plaintiff Fowler's Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

188. Plaintiff Fowler has spent significant time monitoring her financial and other online accounts.

189. Plaintiff Fowler has received an uptick in spam and suspicious calls after the Data Breach, and these issues are ongoing.

## CLASS ACTION ALLEGATIONS

184. Pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of a Class as defined below:

> All individuals residing in the United States whose Private Information was compromised as a result of the Data Breach.

185. Excluded from the Class are Arbor, any entity in which Arbor has a controlling interest, and Arbor's officers, directors, legal representatives, successors, subsidiaries, and assigns.

Also excluded from the Class are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

186. Plaintiffs reserve the right to modify or amend the definition of the proposed Class as additional information becomes available to Plaintiffs.

187. **Numerosity:** The Class Members are so numerous that individual joinder of all Class Members is impracticable. Arbor disclosed to the U.S. Department of Health and Human Services Office for Civil Rights that the Data Breach affected over 17,000 individuals. All Class Members' names and addresses are available from Arbor's records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

188. **Commonality:** There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether and to what extent Arbor had a duty to protect the Private Information of Class Members;

b. Whether Arbor was negligent in collecting and storing Plaintiffs' and Class Members' Private Information;

c. Whether Arbor had duties not to disclose the Private Information of Class Members to unauthorized third parties;

d. Whether Arbor took reasonable steps and measures to safeguard Plaintiffs' and Class Members' Private Information;

e. Whether Arbor failed to adequately safeguard the Plaintiffs' and Class Members' Private Information;

f. Whether Arbor failed to implement and maintain reasonable security policies and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

g. Whether Arbor adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

h. Whether Plaintiffs and Class Members are entitled to actual damages, statutory damages, and/or punitive damages because of Arbor's wrongful conduct;

i. Whether Plaintiffs and Class Members are entitled to restitution because of Arbor's wrongful conduct;

j. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm they face because of the Data Breach; and

k. Whether Plaintiffs and Class Members are entitled to identity theft protection for their respective lifetimes.

189. **Typicality:** Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was disclosed by Arbor. Plaintiffs' claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through Arbor's common misconduct. Plaintiffs are advancing the same claims and legal theories individually and on behalf of all other Class Members, and there are no defenses that are unique to Plaintiffs. Plaintiffs' claims and Class Members' claims arise from the same operative facts and are based on the same legal theories.

190. **Adequacy:** Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Arbor to obtain relief for the Class. Plaintiffs have no conflicts of interest with the Class. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach litigation. Plaintiffs intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

191. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Arbor has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards

of conduct toward the Class Members, and making final injunctive relief appropriate with respect to the Class as a whole. Arbor's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Arbor's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

192. **Superiority:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Arbor. Even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

193. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Arbor would necessarily gain an unconscionable advantage in non-class litigation, since Arbor would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs was exposed is representative of that experienced by Class Members and will establish the right of each

Class Member to recover on the causes of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

194. The litigation of Plaintiffs' claims is manageable. Arbor's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with maintenance of this lawsuit as a class action.

195. Adequate notice can be given to Class Members directly using information maintained in Arbor's records.

196. Unless a class-wide injunction is issued, Arbor may continue to maintain inadequate security with respect to the Private Information of Class Members, Arbor may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Arbor may continue to act unlawfully as set forth in this Complaint.

197. Arbor has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

**COUNT I**
**NEGLIGENCE & NEGLIGENCE PER SE**
**(on behalf of Plaintiffs and the Class)**

198. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

199. Arbor knowingly collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding, securing and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. That duty included, among other things, designing, maintaining,

and testing Arbor's security protocols to ensure that Plaintiffs' and Class Members' Private Information in Arbor's possession was adequately secured and protected, that Plaintiffs' and Class Members' Private Information on Arbor's networks were not accessible to criminals without authorization, and that Arbor's employees tasked with maintaining such information were adequately trained on security measures regarding the security of Plaintiffs' and Class Members' Private Information.

200. Plaintiffs and Class Members entrusted their Private Information to Arbor with the understanding that Arbor would safeguard their information, use their Private Information for business purposes only, and not disclose their Private Information to unauthorized third parties.

201. Arbor knew or reasonably should have known that a failure to exercise due care in the collecting, storing, and using Plaintiffs' and Class Members' Private Information involved an unreasonable risk of harm to Plaintiffs and Class Members.

202. Arbor also had a duty to have procedures in place to detect and prevent the improper access and misuse of Plaintiffs' and Class Members' Private Information.

203. A breach of security, unauthorized access, and resulting injury to Plaintiffs and Class Members was reasonably foreseeable, particularly in light of prior data breaches and disclosures prevalent in today's digital landscape, including the explosion of data breaches involving similarly situated healthcare providers.

204. Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices and procedures. Arbor knew or should have known of the inherent risks in collecting and storing Plaintiffs' and Class Members' Private Information, the critical importance of providing adequate security of that information, the necessity for encrypting PHI

stored on Arbor's systems, and that they had inadequate IT security protocols in place to secure Plaintiffs' and Class Members' Private Information.

205. Arbor's misconduct created a foreseeable risk of harm to Plaintiffs and Class Members. Arbor's misconduct included, but was not limited to, failure to take the steps and opportunities to prevent the Data Breach as set forth herein.

206. Plaintiffs and Class Members had no ability to protect their Private Information that was in Arbor's possession.

207. Arbor was in a position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

208. Arbor had, and continues to have, a duty to timely disclose that Plaintiffs' and Class Members' Private Information within their possession was compromised and precisely the type(s) of information that were compromised.

209. Arbor had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Private Information.

210. Arbor systematically failed to provide adequate security for data in its possession.

211. Arbor, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within its possession.

212. Arbor, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class Members' Private Information.

213. Arbor, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiffs and Class Members that the Private Information within Arbor's possession might have been compromised and precisely the type of information compromised.

214. Arbor's breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

215. But for all of Arbor's acts of negligence detailed above, including allowing cyber criminals to access its systems containing Plaintiffs' and Class Members' Private Information, that Private Information would not have been compromised.

216. Plaintiffs never transmitted their own unencrypted PHI over the Internet or any other unsecured source.

217. Following the Data Breach, Plaintiffs' Private Information has been seized by unauthorized third parties who are now free to exploit and misuse that Private Information, and Plaintiffs are unable to prevent its further dissemination. Plaintiffs' Private Information are forever compromised.

218. But for the Data Breach, Plaintiffs would not have incurred the loss and publication of their Private Information and other injuries.

219. There is a close causal connection between Arbor's failure to implement security measures to protect Plaintiffs' and Class Members' Private Information and the harm suffered, or risk of imminent harm suffered by Plaintiffs and Class Members. Plaintiffs' and Class Members' Private Information was accessed and compromised as the proximate result of Arbor's failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures and encryption.

220. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, loss of privacy, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

221. As a result of Arbor's negligence and breach of duties, Plaintiffs and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes.

222. Plaintiffs seek the award of actual damages on behalf of themselves and the Class.

223. Plaintiffs seek injunctive relief on behalf of the Class in the form of an order (1) compelling Arbor to institute appropriate data collection and safeguarding methods and policies with regard to patient information; and (2) compelling Arbor to provide detailed and specific disclosure of what types of Private Information have been compromised as a result of the Data Breach.

224. Plaintiffs' and Class Members' Private Information constitute personal property that was stolen due to Arbor's negligence, resulting in harm, injury and damages to Plaintiffs and Class Members.

225. In addition, violations of statutes which establish a duty to take precautions to protect a particular class of persons from a particular injury or type of injury may constitute negligence *per se*.

226. Section 5 of the FTC Act prohibits "unfair ... practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Arbor, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Arbor's duty in this regard.

227. Arbor violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information and not complying with applicable industry standards, as described in detail herein. Arbor's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored, and the foreseeable consequences of a data breach including, specifically, the damages that would result to Plaintiffs and Class Members.

228. Arbor's violation of Section 5 of the FTC Act constitutes negligence *per se*.

229. Plaintiffs and Class Members are within the class of persons that the FTC Act was intended to protect.

230. The harm that occurred as a result of the Data Breach is the type of harm against which the FTC Act was intended to guard. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and Class Members.

231. In addition, Arbor owed a duty of care to Plaintiffs and Class Members under HIPAA. HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PHI is properly maintained.

232. The Data Breach resulted from multiple failures by Arbor to implement adequate security, including:

a. failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b. failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c. failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. failing to ensure compliance with HIPAA security standards under 45 C.F.R. § 164.306(a)(4);

e. failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1); and

g. failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii).

233. These regulations were intended to protect Plaintiffs and Class Members, and Arbor's failure to abide by them caused Plaintiffs and Class Members damages.

234. Arbor's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' unencrypted Private Information, and Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Arbor's conduct. Plaintiffs and Class Members seek damages and other relief as a result of Arbor's negligence.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(on behalf of Plaintiffs and the Class)**

235. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

236. When Plaintiffs and Class Members provided their Private Information to Arbor, they entered into implied contracts with Arbor, under which Arbor agreed to take reasonable steps to protect Plaintiffs' and Class Members' Private Information, comply with its statutory and common law duties to protect Plaintiffs' and Class Members' Private Information, and to timely notify them in the event of a data breach.

237. Arbor solicited and invited Plaintiffs and Class Members to provide their Private Information as part of Arbor's provision of medical services and related services. Plaintiffs and Class Members accepted Arbor's offers and provided their Private Information to Arbor.

238. When entering into implied contracts, Plaintiffs and Class Members reasonably believed and expected that Arbor's data security practices complied with its statutory and common law duties to adequately protect Plaintiffs' and Class Members' Private Information and to timely notify them in the event of a data breach.

239. Arbor's implied promise to safeguard Private Information is evidenced by, *e.g.*, the representations in Arbor's privacy policy set forth above.

240. Plaintiffs and Class Members would not have provided their Private Information to Arbor had they known that Arbor would not safeguard their Private Information, as promised, or provide timely notice of a data breach.

241. Plaintiffs and Class Members fully performed their obligations under their implied contracts with Arbor.

242. Arbor breached its implied contracts with Plaintiffs and Class Members by failing to safeguard Plaintiffs' and Class Members' Private Information and by failing to provide them with timely and accurate notice of the Data Breach.

243. The losses and damages Plaintiffs and Class Members sustained include, but are not limited to:

a. Theft of their Private Information;

b. Costs associated with purchasing credit monitoring and identity theft protection services;

c. Costs associated with the detection and prevention of identity theft and unauthorized use of their Private Information;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling, and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

g. Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Arbor with the mutual understanding that Arbor would safeguard

Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their Private Information, which remains in Arbor's possession and is subject to further breaches so long as Arbor fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; and

i. Emotional distress from the unauthorized disclosure of Private Information to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class Members.

244. As a direct and proximate result of Arbor's breach of contract, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT III**
**BREACH OF FIDUCIARY DUTY**
**(on behalf of Plaintiffs and the Class)**

245. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

246. In light of the special relationship between Arbor and Plaintiffs and Class Members, Arbor became a fiduciary by undertaking a guardianship of the Private Information to act primarily for Plaintiffs and Class Members, (1) for the safeguarding of Plaintiffs' and Class Members' Private Information; (2) to timely notify Plaintiffs and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Arbor stored.

247. Arbor had a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of its relationship with its clients, in particular, to keep their Private Information secure.

248. Arbor breached its fiduciary duty to Plaintiffs and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

249. Arbor breached its fiduciary duty to Plaintiffs and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiffs' and Class Members' Private Information.

250. Arbor breached its fiduciary duty owed to Plaintiffs and Class Members by failing to timely notify and/or warn Plaintiffs and Class Members of the Data Breach.

251. Arbor breached its fiduciary duty to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' Private Information.

252. As a direct and proximate result of Arbor's breach of its fiduciary duty, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Private Information, which remains in Arbor's possession and is subject to further unauthorized disclosures so long as Arbor fail to undertake appropriate and adequate measures to protect the

Private Information in their continued possession; (vi) future costs in terms of time, effort, and money that will be expended as result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members; and (vii) the diminished value of Arbor's services they received.

253. As a direct and proximate result of Arbor's breach of its fiduciary duty, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT IV**
**BREACH OF CONFIDENCE**
**(on behalf of Plaintiffs and the Class)**

254. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

255. Plaintiffs and Class Members have an interest, both equitable and legal, in the Private Information that was conveyed to, collected by, and maintained by Arbor and that was ultimately accessed or compromised in the Data Breach.

256. As a vendor in the healthcare industry, Arbor has a special relationship to its employees, customers, and/or clients, like Plaintiffs and the Class Members.

257. Because of that special relationship, Arbor was provided with and stored private and valuable Private Information belonging to Plaintiffs and Class Members, which it was required to maintain in confidence.

258. Plaintiffs and Class Members provided Arbor with their Private Information pursuant to Arbor's express and/or implied agreement to limit the use and disclosure of such Private Information.

259. Arbor had a common law duty to maintain the confidentiality of Plaintiffs' and Class Members' Private Information.

260. Arbor owed a duty to Plaintiffs and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons.

261. Plaintiffs and Class Members have a privacy interest in their personal and health matters, and Arbor had a duty not to disclose their confidential personal and health-related information.

262. As a result of the parties' relationship of trust, Arbor had possession and knowledge of the confidential Private Information of Plaintiffs and Class Members.

263. Plaintiffs' and Class Members' Private Information is not generally known to the public and is confidential by nature.

264. Plaintiffs and Class Members did not consent to nor authorize Arbor to release or disclose their Private Information to an unknown criminal actor.

265. Arbor breached the duty of confidence it owed to Plaintiffs and Class Members when Plaintiffs' and Class Members' Private Information was disclosed to unknown criminal hackers by way of Arbor's acts and omissions, as alleged herein.

266. Arbor breached its duties of confidence by failing to safeguard Plaintiffs' and Class Members' Private Information, including by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of the Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the

safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the Data Breach at the time it began or within a reasonable time thereafter; (g) failing to follow its own privacy policies and practices published to its clients; (h) storing Private Information in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and (i) making an unauthorized and unjustified disclosure and release of Plaintiffs' and Class Members' Private Information to a criminal third party.

267. But for Arbor's wrongful breach of its duty of confidences owed to Plaintiffs and Class Members, their privacy, confidences, and Private Information would not have been compromised.

268. As a direct and proximate result of Arbor's breach of Plaintiffs' and Class Members' confidences, Plaintiffs and Class Members have suffered or will suffer injuries, including: the erosion of the essential and confidential relationship between Arbor—as a health services provider—and Plaintiffs and Class Members as employees, customers, and/or clients; loss of their privacy and confidentiality in their Private Information; theft of their Private Information; costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts; costs associated with purchasing credit monitoring and identity theft protection services; lowered credit scores resulting from credit inquiries following fraudulent activities; costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Arbor's Data Breach - including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts; the imminent and certainly impending

injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals; damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Arbor with the mutual understanding that Arbor would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others; continued risk of exposure to hackers and thieves of their Private Information, which remains in Arbor's possession and is subject to further breaches so long as Arbor fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; and/or mental anguish accompanying the loss of confidences and disclosure of their confidential Private Information.

269. Arbor breached the confidence of Plaintiffs and Class Members when it made an unauthorized release and disclosure of their confidential Private Information and, accordingly, it would be inequitable for Arbor to retain the benefit at Plaintiff' and Class Members' expense.

270. As a direct and proximate result of Arbor's breach of confidences, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**COUNT V**
**UNJUST ENRICHMENT**
**(on behalf of Plaintiffs and the Class)**

271. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

272. Plaintiffs and Class Members have an interest, both equitable and legal, in their PHI and PII that was conferred upon, collected by, and maintained by Arbor and that was stolen in the Data Breach.

273. Arbor benefited from the conferral upon it of Plaintiffs' and Class Members' Private Information, and by its ability to retain and use that information. Arbor understood that it so benefited.

274. Arbor also understood and appreciated that Plaintiff' and Class Members' PHI and PII was private and confidential and that its value depended upon Arbor maintaining its privacy and confidentiality.

275. But for Arbor's willingness and commitment to maintain its privacy and confidentiality, that PHI and PII would not have been transferred to and entrusted with Arbor. Further, if Arbor had disclosed that its data security measures were inadequate, Arbor would not have been permitted to continue in operation by regulators and the healthcare marketplace.

276. As a result of Arbor's wrongful conduct as alleged in this Complaint (including, among other things, its failure to employ adequate data security measures, its continued maintenance and use of Plaintiffs' and Class Members' Private Information without having adequate data security measures, and its other conduct facilitating the theft of that Private Information), Arbor have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and Class Members.

277. Arbor's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compilation and use of Plaintiffs' and Class Members' sensitive PHI and PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers.

278. Under the common law doctrine of unjust enrichment, it is inequitable for Arbor to be permitted to retain the benefits it received, and is still receiving, without justification, from the use of Plaintiffs' and Class Members' Private Information in an unfair and unconscionable manner.

Arbor's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

279. The benefit conferred upon, received, and enjoyed by Arbor was not conferred officiously or gratuitously, and it would be inequitable and unjust for Arbor to retain the benefit.

**COUNT VI**
**INJUNCTIVE/DECLARATORY RELIEF**
**(on behalf of Plaintiffs and the Class)**

280. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in the preceding paragraphs.

281. Arbor owes a duty of care to Plaintiffs and Class Members requiring it to adequately secure Private Information.

282. Arbor still stores Plaintiffs' and Class Members' Private Information.

283. Since the Data Breach, Arbor has announced no specific changes to its data security infrastructure, processes, or procedures to fix the vulnerabilities in its computer systems and/or security practices which permitted the Data Breach to occur and, thereby, prevent similar incidents from occurring in the future.

284. Arbor has not satisfied its legal duties to Plaintiffs and Class Members.

285. Actual harm has arisen in the wake of the Data Breach regarding Arbor's duties of care to provide security measures to Plaintiffs and Class Members. Further, Plaintiffs and Class Members are at risk of additional or further harm due to the exposure of their Private Information, and Arbor's failure to address the security failings that led to that exposure.

286. Plaintiffs, therefore, seek a declaration that: (a) Arbor's existing security measures do not comply with its duties of care to provide adequate security; and (b) to comply with its duties

of care, Arbor must implement and maintain reasonable security measures, including, but not limited to, the following:

a. ordering that Arbor engage third-party security auditors as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Arbor's systems on a periodic basis, and ordering Arbor to promptly correct any problems or issues detected by such third-party security auditors;

b. ordering that Arbor engage third-party security auditors and internal personnel to run automated security monitoring;

c. ordering that Arbor audit, test, and train its security personnel regarding any new or modified procedures;

d. ordering that Arbor segment PHI by, among other things, creating firewalls and access controls so that if one area of Arbor's system is compromised, hackers cannot gain access to other portions of Arbor's systems;

e. ordering that Arbor purge, delete, and destroy in a reasonably secure manner Private Information not necessary for its provision of services;

f. ordering that Arbor conduct regular computer system scanning and security checks; and

g. ordering that Arbor routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, individually and on behalf of all others similarly situated, pray for relief as follows:

a. for an Order certifying the Class as defined herein, and appointing Plaintiffs and their counsel to represent the Class;

b. for equitable relief enjoining Arbor from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiffs and Class Members;

c. for equitable relief compelling Arbor to use appropriate cybersecurity methods and policies with respect to Private Information collection, storage, and protection, and to disclose with specificity to Class Members the types of Private Information compromised;

d. for an award of damages, including actual, nominal, consequential, enhanced compensatory, and punitive damages, as allowed by law in an amount to be determined;

e. for an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f. for prejudgment interest on all amounts awarded; and

g. such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: November 13, 2025

Respectfully submitted,

**THE MILLER LAW FIRM, P.C.**

*/s/ Gregory A. Mitchell*
Gregory A. Mitchell (P68723)
950 West University Drive
Rochester, MI 48307
(248) 841-2200
gam@millerlawpc.com

**BAILEY & GLASSER LLP**
Bart D. Cohen
1622 Locust Street
Philadelphia, PA 19103
(215) 274-9420
bcohen@baileyglasser.com

*Interim Co-Lead Counsel*

# CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2025, I electronically filed the foregoing document(s) using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ Gregory A. Mitchell*

Gregory A. Mitchell (P68723)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Ste. 300
Rochester, MI 48307
Tel: (248) 841-2200
gam@millerlawpc.com